IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| BETTY McSWEEENY, INDIVIDUALLY AND AS SPECIAL ADMINISTRATOR FOR THE ESTATE OF FRANKIE D. PRAY SR., <br><br> Plaintiff, <br><br> v. <br><br> A. C. AND S., INC., et al., <br><br> Defendants. | C.D. Ill. Case No. 4:96-cv-04025-HAB <br><br> *(Remanded from E.D. Pa. Case No. 2:08-cv-91884-ER; MDL No. 875)* <br><br> Hon. Harold A. Baker |

## GE'S OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

In a misguided effort to obtain a tactical advantage, plaintiff's lawyers have filed a baseless motion asking this court to impose a severe sanction on General Electric Company ("GE") that will tip the balance in their favor at trial in a case where they otherwise have no evidence to prove their claims. Although GE collected and produced every relevant document in its possession in response to plaintiff's discovery more than a year and a half ago, a 50 year-old contract for the sale of goods was not found among those documents. The lawyers now demand the imposition of a drastic sanction based upon nothing more than GE's inability to locate this ancient contract. The motion for sanctions is, in the words of the Seventh Circuit, "without a plausible legal or factual basis and lacking in justification." *The Jolly Group, Ltd. v. Medline Industries, Inc.*, 435 F.3d 717, 720 (7th Cir. 2006). The motion for sanctions itself is therefore sanctionable under 28 U.S.C. § 1927. It should be denied.

## FACTS

Half a century ago, in the early 1960s, GE contracted with Commonwealth Edison Company ("ComEd"), a large public electric utility company, to design, manufacture, and sell two steam turbine-generators for installation at ComEd's Quad Cities Nuclear Power Station ("Quad Cities"), which was then under construction. In 1966, some time after this turbine sales contract had been executed and the turbine design completed, GE created the master parts lists for those turbines. Many years later, those parts lists were located and produced to plaintiff in discovery, and GE provided a turbine engineering witness to answer all of plaintiff's questions about them. Deposition of Paul Banaszewski[1] (11/14/13) at 16:17-17:7 (attached hereto as Ex. A). Once the turbines had been manufactured, they were shipped from GE's factory in Schenectady, New York to the Quad Cities construction site in 1969 and, after being assembled on site and integrated into the power plant, ComEd placed them into commercial service in 1972. *Id.* at 66:16-19.

Four decades later, in March of 2012, while this case was pending in the MDL, plaintiff's counsel ("CVLO") served on GE a request for production of documents. In response to this request, as later explained by GE's Rule 30(b)(6) witness, Paul Banaszewski, GE "searched for all documentation regardless of what it was on the units at Quad Cities by serial number, and that would have been the service office in Atlanta, the field office in Chicago, and Schenectady." *Id.* at 49:3-21. As the GE witness explained repeatedly, "[A]ll of their files on the units by serial number at Quad Cities, because that's how they file, they file by serial number, all their information was gathered and produced." *Id.* at 48. "[A]ll available files were gathered, copied,

---

[1] Mr. Banaszewski is a retired GE engineer who worked in GE's steam turbine business for more than 32 years. Banaszewski Dep. (Ex. A) at 110:13-15. He was designated by GE as its Rule 30(b)(6) witness to testify on subjects related to the GE steam turbines at Quad Cities. *Id.* at 14:11-16:11.

2

and produced." *Id*. at 47:13-17.  "[W]hatever is available has been produced." *Id*. at 97:4.  "I think I said numerous times, whatever documentation General Electric found relative to Quad Cities was produced in the documentation that you have and that I looked at, too." *Id*. at 98:10-14.  As GE made clear when responding to duplicative discovery served by CVLO in September 2013, "GE made available more than 60,000 pages of turbine drawings for four days in March 2012 in Schenectady, New York. GE also made available approximately 21,000 pages of turbine files for two days in May 2012 in Chicago, Illinois.  Plaintiff's counsel attended these productions and selected over 200 turbine drawings and over 300 pages of documents from the turbine files for copying and production."  GE's Objections and Responses To Plaintiff's Requests For Production For Quad Cities Nuclear Power Station (Ex. B) at 2-3.

  The lawyer who drafted and filed this motion for sanctions professes to be mystified why, among the tens of thousands of pages of documents that were produced, GE has been unable to find for his use in this lawsuit in 2014 a contract for the sale of goods (turbines) that was executed some 50 years ago and that GE had fully performed some 40 years ago, after the turbines were placed into commercial operation and the one-year warranty period had expired. He speculates that because the Quad Cities power plant was a big construction project for ComEd when it was built half a century ago, GE somehow must have had a legal obligation to keep the turbine contract handy just in case he came along four decades later and filed a lawsuit. Because the turbine contract has not been found, apparently having been lost, misplaced, or disposed of at some unknown point during the past 40 to 50 years, he argues that this court should instruct the jury that it may draw an adverse inference against GE.

  What this lawyer conceals from the court in the instant motion is that the absence of this ancient sales contract is no mystery to him at all.  He fully explored the subject of GE's turbine

contract retention practices with the same GE witness in another, virtually identical steam turbine case in the MDL in June 2012, and the explanation he received was perfectly reasonable and unremarkable. As Mr. Banaszewski explained to this lawyer, GE offices normally retained turbine sales contracts only for as long as the office regarded them as serving a business purpose, which usually coincided with the expiration of the one-year warranty period:

> Q. Copies of contracts were maintained at the regional field offices; is that the typical practice?
>
> A. It would have been on a business-need basis. This question comes up all the time. You know, would you expect a contract to still exist on turbines that were built in the 1940s? I would be very surprised to find that, because there's really no business need to keep a contract like that. So contracts did exist in the field offices; how long they existed was on a business-need basis.
>
> Q. So what's a business-need basis for the field offices?
>
> A. Pretty much their call. Some of it was dictated by physical specs. I mean, you've got a bunch of file cabinets and you only had so much room, and you look back and you say, We've got a bunch of contracts here from turbines that are 40 years old, maybe some of them don't even exist; I have got to get rid of them because I need space.
>
> The other might be the contract is so irrelevant -- I mean, you've gone past the initial operation of the turbine and the warranty period. As I said before, the definition of the turbine is in the master parts list, not in the contract. Somebody would make a decision, I really don't need that document anymore.
>
> Q. How about a ten-year old turbine, would that customarily be thrown out after ten years of contracts?
>
> A. There is no rule of thumb or if it's ten years, what about eleven years, what about nine years? It was based on a business-need basis.
>
> Q. I'm asking just based on your knowledge about GE's practices, was it common that they were thrown out within ten years or was it usually longer than that?
>
> A. I really couldn't say. Again, because each office operated as its own, call it, business center. They would make those decisions.

> Q. How about in marketing, what was the --
>
> A. Same logic would apply. Probably early on, for some amount of time, undefined, you might keep contracts because that customer was active in building power plants in general. So you said, We're going to keep these contracts for a few more years because this customer may refer back to something that he was interested in five years ago and so we'll just keep it handy. But that would be one variable that you could say might play into why some contracts were kept a little bit longer than others.
>
> Q. Did General Electric provide warranties on turbines to customers?
>
> A. Certainly that was a negotiated point in a contract, but generally, the answer is yes.
>
> Q. What would be the period of a warranty?
>
> A. Again, most warranties of the vintage we're talking about here, '60s and before, the general warranty period was one year, workmanship and material.

Deposition of Paul Banaszewski (*Unzicker* case, 06/28/12) at 37:9-39:17 (Ex. C).

## ARGUMENT

**I. PLAINTIFF'S MOTION FOR SANCTIONS HAS NO MERIT BECAUSE GE HAD NO LEGAL DUTY TO RETAIN TURBINE SALES CONTRACTS INDEFINITELY**

Plaintiff's conclusory claim that GE had a legal obligation to retain a 50 year-old turbine sales contract indefinitely is without merit. A spoliation sanction is "proper only where a party has a duty to preserve evidence because it knew, or should have known, that *litigation was imminent*." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) (emphasis added); *accord. Sokn v. Fieldcrest Cmty. Unit Sch. Dist. No. 8*, No. 10-CV-1122, 2014 WL 201534, at *5 (C.D. Ill. Jan. 17, 2014) ("The existence of a general duty to preserve is not the proper prerequisite for assessing sanctions in federal court though. The duty to preserve at issue must relate directly to the litigation itself."). Thus, plaintiff misstates the law when she

5

asserts that the severe sanction she seeks is authorized because GE supposedly should have known that the Quad Cities turbine contract was a "vitally important document that would have been relevant to *various forms* of *potential* litigation that *could* arise." Pl.'s Br., D.E. 115, at 6 (emphasis added). Speculative, "potential" litigation by unknown claimants that might or might not arise decades after a contract was performed cannot support a duty to retain documents and the imposition of sanctions. Rather, a duty to preserve arises only in relation to the specific, identified litigation at issue. *Sokn*, No. 10-CV-1122, 2014 WL 201534, at *5.

This is especially true for large companies such as GE that regularly engage in numerous commercial transactions. To hold otherwise would impose a virtually eternal document hold under which such companies, simply by acting in the ordinary course of their business, would be required to preserve all contracts and other documents related to their operations because, to borrow plaintiff's ill-advised phrase, various forms of "potential litigation" could always arise, even decades after a contract had been fully performed. No company could ever throw anything away for fear that a court, acting at the behest of a lawyer for an opposing party in some then unknown future case, would impose sanctions many years after the fact if a document claimed to be relevant to the case could not be found.

This is not the law for good reason. It is bad policy and is both commercially and legally unreasonable. As GE witness Banaszewski has testified, sales contracts such as the one relating to the Quad Cities turbines were retained by GE "on a business-need basis." Banaszewski Dep. (Ex. C) at 37:11-18 ("So contracts did exist in the field offices; how long they existed was on a business-need basis."); *see also* Banaszewski Dep. (Ex. A) at 49:3-12 (explaining there has never been a single "repository for contracts" at GE). Outdated sales contracts such as the one at issue here were no longer retained when they ceased to serve a business purpose — for example,

6

because the one-year warranty period had expired and GE's contractual obligations were fully discharged. Banaszewski Dep. (Ex. C) at 37:21-39:8. As Mr. Banaszewski noted, a typical turbine contract from the long ago era in which the Quad Cities turbines were manufactured included a warranty period of one year. *Id.* at 39:14-17. After that, GE's contractual obligations were exhausted. GE had fully performed and the contract no longer served any business purpose for GE. Beyond that point in time, absent notice to GE of specific, *imminent* litigation in which the contract was relevant, GE had no legal obligation to preserve the contract for decades against the wholly speculative possibility that it might someday be sued by someone about the subject matter of the contract. Under the law, GE is entitled to operate its business as it sees fit and to maintain its business records in the manner that is considers most efficient for its operations (absent knowledge of imminent litigation involving such records). The law does not require GE to maintain a historical archive of ancient business records to suit the convenience of lawyers who might sue it decades in the future, on pain of severe legal penalties. This is not the law today, and it most certainly was not the law in the 1960s when the contract at issue was executed, or in the early 1970s when the contract was fully performed.

       Indeed, as a matter of Illinois public policy, the legislature has determined that GE has no liability arising from the steam turbines that were designed for, assembled at, and ultimately placed into commercial service in 1972 as integral components of ComEd's Quad Cities nuclear power plant. *See* 735 ILCS 5/13-214(b) ("No action based upon tort, contract, or otherwise may be brought against any person for an act or omission of such person in the design, planning, supervision, or observation or management of construction, or construction of an improvement to real property after ten years have elapsed from the time of such act or omission."). GE has filed a motion for summary judgment based in part upon that Illinois statute of repose, and GE

7

incorporates by reference herein its repose argument from that motion. *See* GE's Memorandum of Law in Support of its Motion for Summ. J., D.E. 119-1 at 7-9. It would be anomalous, to say the least, for GE to be absolved of liability as a matter of Illinois statutory law, while this court at the same time instructed the jury that it could draw an adverse inference against GE because the 50 year-old contract for the work could not be located. Given the strong Illinois public policy of finality that is reflected in the statute of repose, it would be manifest error for a federal court sitting in diversity to create a contrary policy requiring contracts concerning the very matter to which the repose statute applies to be kept forever. In effect, the court would be facilitating an end run around Illinois public policy by instructing the jury as requested by plaintiff. This is not a proper role for federal courts in diversity cases; the duty of federal courts in diversity cases is to apply existing state law rather than to invent new state law.

II.    **PLAINTIFF'S MOTION MUST BE DENIED BECAUSE PLAINTIFF HAS UTTERLY FAILED TO ESTABLISH THAT GE ACTED IN BAD FAITH**

It is beyond dispute under the pertinent cases that "bad faith" is a *sine qua non* for the sanction demanded by plaintiff. "The mere fact that a party destroyed a document or is unable to produce a document does not, standing alone, warrant an inference that the document would have contained information adverse to that party's case." *United States v. Dish Network, L.L.C.*, 292 F.R.D. 593, 600 (C.D. Ill. 2013) (citing *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002)). To obtain a spoliation sanction, plaintiff must prove GE acted in bad faith in failing to locate the half century old Quad Cities turbine contract. *Id.*; *Bracey v. Grondin*, 712 F.3d 1012, 1019-20 (7th Cir. 2013) (holding a party must have "intentionally destroy[ed] evidence in bad faith" in order before a district judge may "instruct the jury to infer the evidence contained incriminatory content"). "Such a showing is a prerequisite to imposing sanctions for the destruction of evidence." *Trask-Morton*, 534 F.3d at 681.

8

To establish the requisite bad faith, a party must show that the missing evidence was intentionally destroyed for the purpose of hiding adverse information. *Norman–Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428-29 (7th Cir. 2010) ("The crucial element in a spoliation claim is not the fact that the documents were destroyed but that they were destroyed for the purpose of hiding adverse information."); *Sokn*, No. 10-CV-1122, 2014 WL 201534, at *5 (explaining a court must make a finding of bad faith, meaning the evidence was destroyed for the purpose of hiding information from the particular plaintiff and therefore, if evidence was missing before there was a "reasonable indication of potential litigation with Plaintiff, then it is substantially less likely the destruction was done to hide discoverable information from the Plaintiff"). It is the burden of the party seeking sanctions to prove bad faith. *Bracey*, 712 F.3d at 1019; *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001) (denying adverse inference instruction because the moving party "offered no evidence, other than his own speculation" to establish intentional unavailability of documents).

Plaintiff makes no effort whatsoever to prove that GE acted in bad faith in failing to locate the 50 year-old Quad Cities turbine contract among the 80,000 plus pages it did find and produce. Plaintiff freely concedes, as she must, that a showing of bad faith is not possible. Instead, plaintiff seeks to duck the controlling law by suggesting that she need not prove bad faith because she is only asking for a "permissive" adverse inference instruction. In making this argument plaintiff cites a handful of decisions from other district courts, none of which are binding on this court and all of which are readily distinguishable. For example, in *Banks v. Enova Fin.*, No. 10-C-4060, 2012 U.S. Dist. LEXIS 173649, at *10-12 (N.D. Ill. July 10, 2012), the court found that the defendant employer negligently failed to preserve telephone recordings that were key to its decision to fire the plaintiff. The court sanctioned the employer, reasoning

9

that the recordings were destroyed while the employer was defending the plaintiff's unemployment claim, and at that time — even though formal litigation had not yet commenced — the employer should have known litigation was imminent, or at a minimum, should have retained the recordings until the unemployment dispute was resolved. *Id.* at *12. Here, in contrast, there is no evidence that GE destroyed the turbine sales contract, much less that it did so when litigation with plaintiff was imminent. Indeed, unlike the plaintiff in *Banks*, who was the defendant's employee, the plaintiff here was completely unknown to GE until it was served with the complaint, and the specifics of the claim as to the turbines at Quad Cities were unknown until fleshed out through subsequent discovery.

The only other cases plaintiff cites all considered sanctions in the context of an alleged discovery violation, where a party's failure to preserve evidence in the face of a litigation hold or court order was plainly negligent. Here, in contrast, plaintiff contends, and GE agrees, that the Quad Cities turbine contract was lost, misplaced, or disposed of at some unknown point in the past 50 years, *before this case began*. Therefore, the reasoning of the cases plaintiff cites is inapplicable. For instance, *Domanus v. Lewicki*, 284 F.R.D. 379, 384 (N.D. Ill. 2012) concerned the destruction of a computer hard drive after a litigation hold was put in place and after the court specifically reminded the parties of their obligation to preserve evidence. Likewise, in *Olesky v. General Electric Co.*, No. 06-C-1245, 2011 U.S. Dist. LEXIS 87271, at *27-29 (N.D. Ill. Aug. 8, 2011), the court considered a violation of a litigation hold where documents were allegedly negligently destroyed *after* the litigation had commenced. *See also In re Pradaxa Prods. Liab. Litigation*, MDL No. 2385, 2013 U.S. Dist. LEXIS 177597, at *7-9 (S.D. Ill. Dec. 18, 2013) (considering a party's failure to comply with a court's discovery order). Even under the reasoning of the cases plaintiff purports to rely on, at a minimum, a finding of "fault" is required

10

to impose sanctions. *See, e.g.*, *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992). A finding of "fault" concerns the "reasonableness of the conduct – or lack thereof – which eventually culminated in the violation." *Id.* Plaintiff has not proved any evidence (since there is none) that GE's conduct was unreasonable, much less that the failure to preserve the 50-year-old turbine contract was a violation of any litigation hold or court order.

**III.   THIS COURT SHOULD DENY PLAINTIFF'S MOTION BECAUSE SHE CANNOT SHOW ANY PREJUDICE**

Finally, plaintiff failed to attempt to obtain the contract through other easily available means before filing her motion seeking to impose sanctions on GE. Although plaintiff claims that the missing turbine contract is central to her claims, she made no effort during discovery to obtain the contract from the most logical alternative source: ComEd. There were two parties to the turbine sales contract, GE as the seller and ComEd as the buyer. ComEd has been the owner and operator of the Quad Cities nuclear power plant and all of its equipment for half a century. It operates in a highly-regulated business environment, governed by both federal agencies such as the Nuclear Regulatory Commission and by Illinois administrative bodies such as the Illinois Commerce Commission. As part of it nuclear licensing obligations and state rate making proceedings, ComEd has far greater need and likelihood of retaining 50 year-old contracts for the purchase of the equipment it owns than GE does. At a minimum, plaintiff should have subpoenaed the Quad Cities turbine contract from ComEd or its successor. However, plaintiff chose not to do so, and thus, she cannot now legitimately claim to be prejudiced by the absence of the contract among GE's files. For all that can be known from the current record, the contract might be obtained by plaintiff on request from ComEd. Under that state of affairs it would be serious error for the court to sanction GE simply because it cannot locate its copy of the contract after all these decades.

The law cautions that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *accord. Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980) ("Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion."). Plaintiff's last minute gamesmanship does not warrant the use of this court's vested power to "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993). This is especially so in a situation in which plaintiff herself concedes she cannot prove any "bad faith" on GE's part.

## CONCLUSION

Plaintiff's wholly speculative belief that a 50 year-old turbine contract would somehow aid her claim against GE does not entitle her to an instruction allowing the jury to *assume* as much. Such an instruction, even if a "permissive" one, would unfairly prejudice GE at trial. Plaintiff utterly failed to carry her burden of establishing that GE had a legal duty to retain the turbine contract, and that it unreasonably breached that alleged duty, much less that GE acted in bad faith when it was unable to locate this decades-old contract. Plaintiff also failed to undertake the simple and obvious alternative step of obtaining the contract from ComEd before filing her motion to sanction GE. That failure by itself demonstrates that plaintiff's motion against GE is pure sophistry. The motion for sanctions should be denied. A proposed order is attached hereto as Exhibit D.

Dated:  February 6, 2014                            Respectfully submitted,

                                          GENERAL ELECTRIC COMPANY


By:  */s/ John A. Heller*
     One of Its Attorneys
     John A. Heller
     Michael L. Lisak
     SIDLEY AUSTIN LLP
     One South Dearborn Street
     Chicago, Illinois  60603
     (312) 853-7000
     jheller@sidley.com
     mlisak@sidley.com

**CERTIFICATE OF SERVICE**

   I hereby certify that on February 6, 2014, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

Dated:  February 6, 2014

                 */s/ John A. Heller*