**E-FILED**
Friday, 14 February, 2014  06:45:52 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI) | Civil Action No.  MDL 875 |
| Frankie Pray, | C.D. Ill. Case No. 96-4025 |
| Plaintiff, | *Remanded from E.D. Pa. Case No. 08-CV-91884* |
| v. | |
| CBS Corporation et al | |
| Defendants, | |

## PLAINTIFF'S RESPONSE TO GENERAL ELECTRIC CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Frankie Pray (Pray) responds to and opposes General Electric Corporation's (GE) motion for summary judgment as follows:

## EVIDENCE

I.    *Work History*

Pray was a millwright and a member of union local 2158, which was based in Rock Island, IL (1966-1973), Davenport, IA (1973-1978) and Moline, IL (1978-1998). (Ex. 1 at ¶¶3, 6.) Pray worked as a millwright on original construction and later turbine shutdowns at Quad Cities Nuclear Station (QC) in Cordova, IL. (Ex. 4 at 11, 13-14.) Pray was diagnosed with lung cancer on March 26, 2007. (Ex. 2.) He died on May 9, 2007. (Ex. 3.)

II.    *Exposure to General Electric Asbestos Products*

Pray was present for 18 months during the original construction of QC, beginning in 1968. (Ex. 4 at 42, 57-58.) Pray was referred there to work on the installation of the turbines. (Ex. 4 at 11.) Thereafter he returned to QC for maintenance/repair work on multiple shutdowns, which generally took anywhere from five to eight weeks for each shutdown. (Ex. 4 at 66; Ex. 5 at 11-13; Ex. 6 at 14.)

A.    *Original Construction of QC*

During the time QC was being constructed, GE engineers and representatives were onsite, along with the contractor GE hired to build the facility. (Ex. 4 at 10-12.) Although the millwrights were employed by the contractor, Robert Crider, who was the union local 2158 business manager, GE "called the shots" on the project. (Ex. 4 at 46.) Pre-job conferences were held to determine jurisdictional issues among the trades. (Ex. 4 at 11.) Ninety or a hundred local 2158 millwrights were provided to work on original construction at QC. (Ex. 4 at 55.) Pray was referred by Robert Crider (Crider) to work on the original installation of the turbines. (Ex 4 at 11.)

The two large turbines installed at QC were manufactured by GE and bore the GE emblem. (Ex. 4 at 69, 73; Ex. 5 at 26-27; Ex. 6 at 122.) Once the construction was completed and QC began commercial operation in 1973, GE engineers and personnel were again present, in charge and directing the work during annual turbine maintenance shutdowns. (Ex. 4 at 14; Ex. 5 at 59; Ex 6 at 17.)

2

B.      *Maintenance/Repair on Shutdowns/Outages at QC*

Larry Cooper (Cooper), a millwright, worked on a shutdown at QC with Pray in the 1970s. (Ex. 5 at 25.) Cooper and Pray removed the lids of the turbines and cleaned the turbines. (Ex. 5 at 28-29.) Pray was one of a crew of ten to fifteen millwrights involved in this work. (Ex. 5 at 29.) Preformed insulation below the deck of the turbine had to be removed before the lid could be taken off. (Ex. 5 at 32-33.) The millwrights, including Pray, removed the insulation. (Ex. 5 at 34.) Removing the insulation created dust and the millwrights breathed this dust. (Ex. 5 at 34.) During questioning by defense counsel, Cooper testified Pray was "exposed to asbestos" from the insulation associated with the turbine. (Ex. 5 at 40.)

Cooper also testified Pray was "exposed to asbestos" from working on gaskets. (Ex. 5 at 39.) Every year, at every shutdown, all of the gaskets are removed, everything was cleaned and the gaskets were replaced. (Ex. 5 at 40.) GE supplied the gaskets: "They [GE] gave us whatever we needed." (Ex. 5 at 39-40.) Millwrights grinded off the gasket material after the turbine lids were removed by using a four-inch grinder with an abrasive wheel. (Ex 5 at 8-10.) The millwrights then redid the valves. (Ex. 5 at 8.) They would clean everything and put it back together. (Ex. 5 at 8.) Where the pipes met the shell and the turbine and generator the millwrights had to remove the pipe covering/insulation. (Ex. 5 at 8.) Everything was sealed with gaskets. (Ex. 5 at 9.) This was a dusty process and Cooper breathed the dust created during this work. (Ex. 5 at 10.) Pray also performed this work with Cooper. (Ex 5 at 58.)

Vernon Van Dolah (Van Dolah), another a local 2158 millwright, also worked a six to eight week shutdown with Pray at QC in the 1970s. (Ex. 6 at 14, 17.) The work was directed by the GE erector. (Ex. 6 at 17.) It normally took a shift and a half to scrape off the gasket material,

3

and Pray was doing that work. (Ex. 6 at 16.) There was standard asbestos block insulation that came with brackets across it so the wire could be tied to hold the insulation tight to the unit. (Ex. 6 at 16-17.) There is "always" dust created by manipulation of the block insulation. (Ex. 6 at 151.) Pray was involved in the removal of the block insulation at QC. (Ex. 6 at 15.)

Robert Crider (Crider), another union 2158 millwright, worked a shutdown at QC with Pray in 1979. (Ex. 4 at 13-14.) They worked the day shift with roughly 15 millwrights. (Ex. 4 at 14.) GE engineers and personnel were present to oversee and approve the work. (Ex. 4 at 14.) Pray was working at the high pressure end of the turbine. (Ex. 4 at 15.) At the high pressure end there is a doghouse (cover over the turbine) and insulation that needed to be removed. (Ex. 4 at 15-16.) There was also insulation on the cross-over piping that needed to be removed. (Ex. 4 at 16-17.) Pray would have been within six to eight feet of the insulators removing this insulation. (Ex. 4 at 17.) It would take the insulators about a half an hour to remove insulation from each connection and sack it up. (Ex. 4 at 18.)

Crider observed the insulators removing insulation from the cross-over piping. (Ex. 4 at 18.) They would use a handsaw and cut the insulation around the pipe and remove it so work could be done on a valve or coupling. (Ex. 4 at 18-19.) The cutting of the insulation created dust. (Ex. 4 at 19.) There also was dust on the bolts and flanges which the millwrights would clean and vacuum up any residual dust. (Ex. 4 at 19.) A lot of dust would be in his breathing space. (Ex. 4 at 19.) At one point a piece of insulation labeled "asbestos" need to be removed; Crider was instructed to put a towel over the insulation and knock it off with a hammer but he refused. (Ex. 4 at 95-96.) It was the millwrights' job to clean up the dust created by the removal of insulation. (Ex. 4 at 21.)

4

There were insulation blankets at the high pressure end of the turbine. (Ex. 4 at 21.) The millwrights would clean up the dust created by removal of the blankets. (Ex. 4 at 21.) It was the insulators' job to remove the blankets but the millwrights would generally assist in a cooperative effort. (Ex. 4 at 22.) This would generally take about an hour for each blanket. (Ex. 4 at 22.)

The millwrights also inspected, removed and cleaned gaskets from flanges ranging in size from eighteen inches to two feet. (Ex. 4 at 25-26.) Because Pray was working at the high pressure end of the turbine Pray would have been doing this work. (Ex. 4 at 27.) Some of the gasket material would stick to the flange and would be scraped off with a paint scraper or putty knife. (Ex. 4 at 28-29.)

III.   *Asbestos-Content of GE Turbine Insulation and Gaskets*

Arthur Kleinrath the Commonwealth Edison Construction Department Head Manager. (Ex. 8 at 84; Ex. 7 at 14.) Mr. Kleinrath has testified in depositions that:

•   QC was a "GE turnkey job." (Ex. 8 at 85.)

•   "they [GE] were going to furnish the equipment and erect the unit ready for commercial - for a license from the NRC." (Ex. 8 at 84-85.)

•   GE was responsible at QC for the nuclear steam supply system, piping systems, and the turbine.[1] (Ex. 8 at 85.)

•   The engineering specifications, which GE approved as the successful bidder, specified the thermal insulation to be used in powerhouses. (Ex. 10 at 10-12.)

_____

[1]GE hired Sargent and Lundy as engineer and United Engineers as the construction contractor.  (Ex. 7 at 85.)

5

• A major power plant with more than one steam unit, such as the QC site, would have about 35 miles of thermally insulated piping. (Ex. 10 at 14.)

• Before 1972, when QC was built, Com Ed used asbestos thermal insulation on piping systems and turbine units.  (Ex. 10 at 14-15.)

Kleinrath also testified that as late as 1978 the gaskets used at ComEd locations, such as the QC site, would have contained asbestos:

Q.   Okay.  And when you were asked about Collins in 1978, and you said it's your belief that the thermal insulation materials used there did not contain asbestos because Commonwealth Edison knew all about the hazards of asbestos at that time, you were referring to potential asbestos related health hazards that are associated with pipe covering, block, cement, friable asbestos - -

A.   Correct.

Q.   - - materials; correct?

A.   Right.

Q.   You're not referring to encapsulated materials such as valves, steam packing and gaskets?

A.   No.

(Ex. 10 at 125-26).

This is corroborated by the opinion of Plaintiff's pipefitter expert Joseph Ferriter (Ferriter), who states "gaskets are abundant in the pipefitting industry and were asbestos-containing on any lines operating at temperatures above 120 degrees before 1988." (Ex. 15 at ¶7.)

6

IV.    *Proximate Cause - Medical and Scientific Evidence*

Based on the documents, information and literature available and his own qualifications and experience, Plaintiff's industrial hygiene expert Stephen Kenoyer (Kenoyer) determined Pray was exposed to significant airborne concentrations of asbestos from turbine maintenance work. (Ex. 11  at 5-6.) Kenoyer also concludes similar significant levels of asbestos fibers would be released in the air from the activities of handling and manipulating thermal insulation and gasket removal. (Ex. 12 at 15-23.)

Peter Orris, M.D. (Orris) is certified by the American Board of Preventative Medicine in Occupational Medicine. (Ex. 14.) Dr. Orris reviewed Pray's occupational exposure history and his medical history. (Ex. 13.) Based upon the information available, Dr. Orris concludes that Pray's asbestos exposure was a cause of his lung cancer and subsequent death. (Ex. 13.)

<u>ARGUMENT</u>

I.    *GE's Arguments On Lack of Exposure and Negligence Were Previously Adjudicated*

GE's original motion for summary judgment in this case was filed with the MDL Court in the Eastern District of Pennsylvania on July 9, 2012. (Ex. 17.) The motion argued: (1) lack of evidence of exposure to asbestos-containing products GE was liable for; (2) Pray's claim was barred by the Illinois Statute of Repose; (3) Pray's claim was barred by the "bare metal defense; and (4) Dr. Orris was not qualified to offer expert testimony. (Ex. 17 at 20, 25, 28, 32.) On December 17, 2012, Judge Eduardo Robreno (Robreno) issued an order denying GE's Motion for Summary Judgment. (Ex. 18 at 1.) Robreno held that an issue of fact existed concerning exposure to asbestos-containing products from GE turbines, relying on his finding that Illinois

law did not require a Plaintiff to meet the "frequency, regularity, and proximity"standard in cases

with direct evidence:

> This Court notes that the rationale of the *Thacker* court would not apply where a plaintiff relied upon direct evidence, as there would be no danger of "guesswork" and little (if any) difficulty of proving contact. The Court therefore concludes, as it has previously, that *Thacker* indicates that the "frequency, regularity, and proximity" test is applicable in cases in which a plaintiff relies on circumstantial evidence. This is not inconsistent with the holding of *Lohrmann*.
> . . .
> There is evidence that Decedent was exposed to respirable dust from insulation used in connection with GE turbines at "QC."

(Ex. 18 at 5-6, 10.)

> Robreno further held that GE waived any dispositive arguments for Pray's negligence claims: The Court notes that Plaintiff has also identified evidence that GE employees oversaw the work that exposed Decedent to asbestos at "QC" (i.e., there is evidence of potential negligence on the part of GE) . Defendant GE has not sought summary judgment with respect to Plaintiff's claims sounding in negligence. Therefore, summary judgment is not warranted with respect to these claims.

(Ex. 18 at 11.)

The only grounds on which the court gave GE leave to refile were: the "bare metal"

defense; the Illinois Statute of Repose; and the *Daubert* motion for Dr. Orris:

> Defendant is only liable for this exposure if Illinois law does not recognize the so-called "bare metal defense." The Court has reviewed Illinois law on this issue and has determined that it has not been fully and squarely addressed by any appellate court in Illinois in the context of asbestos litigation. As such, there is no clear statement of Illinois law. . . . A court situated in Illinois is closer to and has more familiarity with - Illinois law and policy. As such, rather than predicting what the Supreme Court of Illinois would do, the Court deems it appropriate to remand this case for a court in Illinois to decide this issue.
> . . .
> Neither the Supreme Court of Illinois nor any appellate court in Illinois has determined whether insulation and/or gaskets used in connection with a turbine (or the turbine itself) constitute(s) an "improvement to real property" under the statute. Because Defendant has failed to establish that the statute of repose is applicable to the claims brought against it,

its motion for summary judgment on this basis is denied, with leave to refile in the transferor court seeking a legal ruling on this issue.

. . .

The Court finds that Defendant's Daubert challenge is more properly addressed by the trial court. Therefore, its motion for summary judgment on this basis is denied, with leave to refile in the transferor court as appropriate.

(Ex. 18 at 10-11.)

This Court has consistently held that dispositive motions will be allowed "If, and only if, the defendants were granted leave by the MDL transferee court to refile dispositive motions in this court . . ." (*See* Ex. 19.) Consistent with the rulings of this Court and the MDL court, GE's other arguments should be barred.

II.     *The Illinois Construction Statute of Repose Does Not Bar The Claims*

    A.     *Original Construction*

The Illinois CSOR is titled: "Construction –Design management and supervision."  The pertinent language from the statute is subsection (b) which states:

No action based upon tort, contract or otherwise may be brought against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property after 10 years have elapsed from the time of such act or omission.

735 ILCS 5/13-214(b).

The CSOR is an affirmative defense.  *Ocasek v. City of Chicago*, 275 Ill. App.3d 628, 636, 656 N.E.2d 44, 50 (1st Dist. 1995).  GE therefore bears the burden of proving the Illinois CSOR applies.  "The burden of establishing a statute-of-limitations defense is on the party asserting it."  *Litchfield Community Unit School Dist. No. 12 v. Specialty Waste Services*, *Inc.*,

325 Ill. App. 3d 164, 168, 757 N.E.2d 641, 644 (5th Dist. 2001) (addressing the CSOR.).  GE

fails to carry this burden.

The Illinois CSOR does not apply to defendants that designed or manufactured but did

not install a product.  "Section 13-214(b) of the Illinois Code of Civil Procedure does not apply

to an action against an entity which designed and/or manufactured but did not install a material

or product which was incorporated into a building during construction unless the manufacturer

can demonstrate its role in the construction extended beyond furnishing standard products

generally available to the public and not custom designed for introduction into the construction

project." *Illinois Masonic Medical Center*, 266 Ill. App.3d 631, 637, 640 N.E.2d 31 (1st Dist.

1994)*;* GE hired a contractor to perform the installation work at the QC site.  The asbestos

containing products GE specified for use at the QC site are standard products and were not

custom designed for the QC site.  The Illinois CSOR thus does not apply.

The Seventh Circuit has held the Illinois CSOR did not bar negligence claims for

standard fireproofing asbestos material manufactured by W.R. Grace.  "Its (W.R. Grace's)

negligence had nothing to do with the installation or application of the Mono-Kote. . . . The

problem was in the design of the Mono-Kote (to include asbestos), the failure to test the product,

and the failure to warn about it.   These negligent acts or omissions, being remote from building

construction, were not the sort of activities that the statute was intended to shield." *State Farm

Mutual Automobile Insurance Company v. W.R. Grace & Company-CONN,* 24 F.3d 955, 957

(7th Cir. 1994).  Plaintiff's claims against are based upon GE's requirement that asbestos be used

at the QC site and GE's failure to warn of the dangers of asbestos.  The Illinois CSOR thus does

not apply.

10

B.        *Repair and Maintenance*

The Illinois CSOR does not apply to ordinary repair and maintenance.  "The express language of the statute of repose does not protect Granite City against the negligent maintenance or negligent operation of the sewer system or lift station after their construction."  *Trtanj v. City of Granite City,* 379 Ill. App. 3d 795, 802, 884 N.E.2d 741, 747 (5th Dist. 2008).  *See also Morietta v. Reese Const. Co.,* 347 Ill. App. 3d 1077, 808 N.E.2d 1046, 1050 (5th Dist. 2004) (in considering the scope of the CSOR, appellate court states "however, an improvement is more than mere repair or replacement"); *Merritt v. Randall Painting Co.*, 314 Ill. App. 3d 556, 561 (1st Dist. 2000) ("An improvement to real property is an addition which amounts to more than a mere repair or replacement and which substantially enhances the value of the property. It does not include ordinary maintenance").  Pray repeatedly worked at the QC site during shutdowns and other routine repair and maintenance.  The Illinois CSOR does not apply to this work.


IV.      *Legal Standard For Summary Judgment*

"Summary judgment is a 'drastic remedy that prevents a claimant from presenting his cause of action to a jury of his peers.  *Bushman v Halm,* 798 F.2d 651, 656 (3rd Cir. 1986).  Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact."  *Am. Eagle Outfitters v Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson y Liberty Lobby. Inc.*, 477 U.S. 242, 247-248 (1986).   A fact is "material" if proof of its existence or non-existence might affect the

outcome of the ligation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

This court views the facts in the light most favorable to the non-moving party, who is the plaintiff herein. "All inferences must be viewed in the light most favorable to the nonmoving party, . . [and] the court must construe facts and draws inferences in favor of the party against whom the motion under consideration is made" *J.S. ex rel. Snyder v Blue Mountain School Dist.* 650 F.3d 915, 925 (3d Cir. 2011). "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reliance Ins. Co. v Moessner*, 121 F.3d 895, 900 (3d Cir. 1997). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there a genuine issue for trial." *Anderson,* 477 U.S. at 250.


V.      *Product Identification/Causation Under Illinois Law*

This court's rulings on defense motions for summary judgment in previous CVLO cases discuss Illinois law regarding proximate cause in asbestos cases.   This discussion is repeated below and is taken from this court's rulings in *Goeken v Arands,* MDL 875 case number 10-68122, docket number 197, issued April 4, 2012, and *Krik v BP America,* MDL 875 case number 11-63473, docket number 327, issued May 16, 2012.

"Ordinarily a jury must determine the issue of proximate cause." *Hollinger v Wagner Min. Equipment Co.,* 667 F.2d 402, 406 (3rd Cir. 1981). In order to establish·causation for an

asbestos claim under Illinois law, a plaintiff must show that the defendant's asbestos was a "cause" of the illness. *Thacker v. UNR Industries, Inc.,* 151 Ill.2d 343, 354 (Ill. 1992).  In negligence actions and strict liability cases, causation requires proof of both "cause in fact" and "legal cause."  *Id.*  "To prove causation in fact, the plaintiff must prove medical causation, i.e., that exposure to asbestos caused the injury, and that it was the defendant's asbestos-containing product which caused the injury." *Zickhur v. Ericsson, Inc.,* 2011 IL App (1st) 103430 at ¶ 36, 962 N.E.2d 974, 983 (Ill. App. 1st Dist. 2011) (citing *Thacker*, 151 Ill.2d at 354).

Illinois courts employ the "substantial factor" test in deciding whether a defendant's conduct was a cause of a plaintiff's harm.  *Nolan v. Weil-McLain,* 233 Ill. 2d 416, 431 (Ill. 2009) (citing *Thacker*, 151 Ill. 2d at 354-55).  Proof may be made by either direct or circumstantial evidence.  *Thacker*, 151 Ill. 2d at 357.  "While circumstantial evidence may be used to show causation, proof which relies upon mere conjecture or speculation is insufficient."  *Thacker*, 151 Ill.2d at 354.

In applying the "substantial factor" test to cases based upon circumstantial evidence, Illinois courts utilize the "frequency, regularity, and proximity" test set out in cases decided by other courts, such as *Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d. 1156 (4th Cir. 1986). *Thacker*, 151 Ill. 2d at 359.  In order for a plaintiff relying on circumstantial evidence "to prevail on the causation issue, there must be some evidence that the defendant's asbestos was put to 'frequent' use in the [Plaintiff's workplace] in 'proximity' to where the [plaintiff] 'regularly' worked."  *Id.* at 364.  As part of the "proximity" prong, a plaintiff must be able to point to "sufficient evidence tending to show that [the defendant's] asbestos was actually inhaled by the

[plaintiff]." This "proximity" prong can be established under Illinois law by evidence of "fiber drift," which need not be introduced by an expert. *Id.* at 363-66.

However, in cases of direct evidence of asbestos exposure, the frequency, regularity, and proximity test does not apply. As this court stated in *Goeken,* "plaintiff is relying on direct evidence (rather than circumstantial evidence) to establish causation. Therefore, he need not satisfy the 'frequency, regularity, and proximity' test" of *Thacker.* In *Krik* this court rejected the defense contention that recent decisions of the Illinois Supreme Court and appellate court had applied this test to cases of direct evidence of exposure. This court stated "because Plaintiff is relying on direct, rather than circumstantial evidence, he need not satisfy the *Lohrmann* 'frequency, regularity, and proximity test.'"

VI.     *Questions of Material Fact Exist Regarding Proximate Cause*

   A.     *GE Thermal Insulation*

A Com Ed witness testified that thermal insulation contained asbestos and that a facility such as QC could have 35 miles of thermally insulated piping. Pray's co-workers testified to their personal observation of Pray working with or near thermal insulation and Pray's being exposed to the dust created by this insulation work. This is direct evidence of Pray's exposure to the asbestos in the thermal insulation  and as such is not subject to the frequency, regularity and proximity standard. This court recognized in *Wright v. A.W. Chesterton, et. al*, E.D. PA 2:11-CV-66748-ER, document number 245 filed 4/06/12 at 5, that bystander exposures proven by direct evidence create a genuine issue of material fact. That same rationale applies here. There

was asbestos in the dust created as a result of the insulation work, and Pray was exposed to and breathed this dust.

      *B.*    *GE Gaskets*

A ComEd witness testified that as late as 1978 the gaskets used at ComEd locations, such as the QC site, would have contained asbestos. This is corroborated by one of plaintiff's experts. Pray's co-workers testified to their personal observation of Pray working with or near gaskets and Pray's being exposed to the dust created by this gasket work.  This is direct evidence of Pray's exposure to the asbestos in gaskets and as such is not subject to the frequency, regularity and proximity standard.  This court recognized in *Wright v. A.W. Chesterton, et. al*, E.D. PA 2:11-CV-66748-ER, document number 245 filed 4/06/12 at 5, that bystander exposures proven by direct evidence create a genuine issue of material fact.  That same rationale applies here. There was asbestos in the dust created as a result of the gasket work, and Pray was exposed to and breathed this dust.

VII.    *GE Improperly Raises the "Bare Metal" Defense*

GE contends it "had no legal duty to warn decedent regarding potential hazards associated with asbestos-containing products that allegedly caused his injuries as GE neither manufactured nor supplied such products at Quad Cities." (Ex. 20 at 11) This is the so-called 'bare metal' defense. The Illinois appellate courts allow recovery against equipment manufacturers or suppliers for injuries caused by replacement component parts manufactured by a third party. In so doing, Illinois courts reject the rationale of the bare metal defense, which is

that an equipment supplier is not liable for injuries caused by the products of a third party.

Instead Illinois appellate courts focus on whether modification is foreseeable.

In *Brdar v. Cottrell*, 372 Ill. App. 3d 690, 867 N.E.2d 1085 (Ill. App. 5th Dist. 2007), the plaintiff was injured when the chain component of a chain and ratchet system for a cargo trailer broke. The plaintiff bought a replacement chain from a third party and claimed the chain broke because the ratchet system applied excessive force to the chain. The case ultimately went to trial before a jury. The defendant requested an instruction that the third party manufacturer of the chain should be considered the sole proximate cause of the plaintiff's injury. The trial court denied the instruction and the appellate court affirmed, stating:

> Cottrell [the defendant manufacturer of the chain and ratchet system] *expected* that its customers would need to replace chains and anticipated that they would purchase replacement chains from suppliers other than Cottrell or Columbus McKinnon. In a products liability case, the manufacturer remains liable if the product is modified in a manner that is foreseeable after it leaves the manufacturer's control.

*Brdar,* 372 Ill. App. 3d at 705, 867 N.E.2d at 1099 (emphasis in original).

The *Brdar* court relied on another Illinois appellate district court decision where the court stated: ". . . Midwest [the manufacturer] would remain liable to the plaintiff if a defect in the equipment [an asphalt silo] contributed to the injury or if Dunn's [the employer] modification or misuse was foreseeable by Midwest." *Owens v. Midwest Tank and Manufacturing Company*, 192 Ill. App. 3d 1039,1044-45 (Ill. App. 1989).

The specifications for the QC site required the use of asbestos in the thermal insulation. Witnesses testified that GE provided the replacement gaskets. GE's motion does not contend it was unaware of the dangers of asbestos. It therefore was foreseeable to GE that the insulation would be removed during maintenance and replaced with additional asbestos insulation. GE

16

itself provided the asbestos containing gasket sused during repair and maintenance.  Based on

*Brdar,* GE's failure to warn of the dangers of asbestos is a proximate cause of Pray's death.

VIII.   *Dr. Orris is a Qualified Expert Under F.R.E. 702 and Daubert*

GE argues Plaintiff's medical expert, Peter Orris, M.D., is unqualified to offer testimony

in this case, and therefore Plaintiff cannot prove medical causation. In support of it's argument

GE attaches its Motion *in Limine* to bar Dr. Orris's testimony filed January 21, 2014. In response,

Plaintiff attaches and incorporates by reference the response to GE's Motion *in Limine*. (Ex. 21.)

<u>CONCLUSION</u>

For the foregoing reasons, the court should deny the motion for summary judgment filed

by defendant General Electric.

Dated: February 14, 2014

/s/ Robert G. McCoy
Allen D. Vaughan
Michael P. Cascino
Robert G. McCoy
Attorney for the Plaintiff
Cascino Vaughan Law Offices, Ltd.
220 S. Ashland Avenue
Chicago, Illinois 60607
(312) 944-0600

17